**SEABOARD LUMBER COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 273–86C.

United States Claims Court.

Jan. 26, 1990.

William T. Lenihan, Seattle, Wash., for plaintiff; Schwabe, Williamson, Wyatt & Lenihan of counsel.

John E. Kosloske, Dept. of Justice, Washington, D.C., for defendant.

## OPINION

ROBINSON, Judge.

This matter is before the court on plaintiff's breach of contract suit regarding a timber sale contract. Plaintiff has moved for summary judgment, and defendant has cross-moved for summary judgment. The parties agree that there are no material issues of fact in dispute. For the following reasons, plaintiff's motion for summary judgment will be denied and defendant's cross-motion for summary judgment will be granted.

### Factual Background

This case involves a timber sale contract between the United States Department of Agriculture Forest Service (Forest Service)

and plaintiff, Seaboard Lumber Company. The contract provides for the sale from defendant to plaintiff of 6,000 MBF of Douglas Fir, Western Hemlock, and other coniferous species from the sale area in the Mt. Baker–Snoqualmie National Forest (sale area). The sale area comprised 190 acres in King County, Washington.

Plaintiff conducted timber harvest operations between September and December 1983. During the winter of 1983–84, a wind storm "blew down" the timber in and adjacent to Units 2, 3, and 4 of the sale area. The contract contains clauses defining "catastrophic damages." These clauses permit a negotiated, joint modification of the contract in the event of "catastrophic damage." However, if catastrophic damage occurs and the parties fail to agree to a modification, these provisions require the Forest Service to unilaterally terminate the contract.

On or about March 16, 1984, plaintiff's and defendant's representatives met to review the results of the winter blowdown, and the procedures available under the contract for modification, and to determine what steps should be taken regarding the "catastrophic damage" which occurred on the sale area. Meanwhile, plaintiff unilaterally recommenced timber harvesting activities in the sale area in April 1984, and continued these activities through July 1984. From April to mid-September, the parties attempted to negotiate a mutually agreeable contract modification. Defendant proposed a formal contract modification under Clause B8.33, which provides for accelerated removal of the blowdown timber and a reduction of stumpage rates. On June 29, 1984, plaintiff rejected this proposal because it objected to the accelerated volume removal requirement. After the parties met on July 18, 1984, plaintiff again advised defendant that the proposed modification was unacceptable and requested termination. Defendant, on or about August 20, 1984, made another proposal which included additional blowdown outside the cutting units and permitted the Forest Service to use defendant's sale access so other purchasers could salvage timber. Plaintiff,

by letter dated August 27, 1984, categorically rejected this proposal which was defendant's last proposal. Plaintiff made no counter proposals to any of defendant's proposals throughout the entire negotiation period.

On September 30, 1984, the Regional Forester by letter cancelled the contract under Standard Provision B8.222 and 37 CFR 223.116(a)(3). The concluding statement in the letter said, that "this action is necessary to expedite removal of windblown timber and minimize losses through deterioration." [1]

When the contract was terminated, 1,312 MBF board feet of timber remained on the sale site from plaintiff's earlier harvesting efforts. Defendant does not dispute that it knew of plaintiff's harvesting efforts which began in April and ended in July, 1984.

By letter dated November 21, 1984, plaintiff filed a claim within the meaning of the Disputes Clause, Clause C9.2 of the contract, with the contracting officer of the Mt. Baker–Snoqualmie National Forest, seeking recovery of $33,600 with interest.[2] Plaintiff allegedly incurred these costs after it recommenced harvesting and before the date of the contract termination. The November 21, 1984 letter, although specifically referring to the Disputes Clause C9.2, made no reference to Clause C8.2 which provides for termination by the Forest Service under specified circumstances. If terminated under Clause C8.2, Clause C9.5 of the contract makes the Forest Service liable for certain identified costs and expenses incurred by the contractor.[3]

The Forest Service denied plaintiff's claim—filed under the Disputes Clause C8.2—on April 29, 1985. That same day, plaintiff filed its complaint in this court seeking *de novo* review of the contracting officer's adverse decision. On August 12, 1986, plaintiff filed its first amended complaint.[4]

---

**1.** The text of the letter, in pertinent part, follows:

In his letter of May 1, District Ranger Michael F. Cooley verified that the blowdown on the Roeber Timber Sale, Contract Number 068287, qualified as catastrophic damage under B2.133. A number of modifications were proposed to you by Contracting Officer Bruce Mateer under B8.33 which would provide for the timely removal of the blowdown. You have refused to agree to the proposed modifications, and on September 24, indicated that Seaboard is not interested in proposing or agreeing to any modification pursuant to B8.33.

Therefore, as authorized by Standard Provision B8.222, and 36 CFR 223.116(a)(3), I hereby cancel this contract effective September 30, 1984. This action is necessary to expedite removal of windthrown timber and minimize losses through deterioration.

**2.** The $33,600 includes:

| | |
|---|---|
| 2,312,000 BF of felled, bucked logs @ $12.50 | $28,900 |
| Unauthorized move-out costs | 3,500 |
| Damages from unreasonable delays in deciding to cancel the contract | 1,200 |
| | $33,600 |

**3.** *C8.2—Termination* (10/77) This contract may be terminated by the Chief, Forest Service, upon a determination that Purchaser's Operations would cause serious environmental damage or would be significantly inconsistent with land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended.

*C9.5—Settlement* (10/77) If this contract is terminated by Forest Service under C8.2, Purchaser agrees that the liability of the United States shall be limited to the sum of (1) the value of unused Purchaser Credit; (2) the estimated expenditures for felling, bucking, lopping, skidding, and decking any products so processed, but not removed from Sale Area because of the termination action; (3) out-of-pocket expenses involved in acquiring and holding the contract such as maintaining performance bonds and cash deposits; and (4) the difference between (a) Current Contract Rates for the remaining uncut volume, and (b) the rates paid for comparable timber on the same National Forest during the preceding 6-month period multiplied times the remaining uncut volume. Comparable timber is timber of similar size and quality with similar topography and access. Cost estimates for items listed in (2) shall be based upon Forest Service appraisal methods in use on the date contract is terminated.

**4.** Plaintiff's first amended complaint stated, in summary, four grounds for relief:

(1) Clause C8.2 should be applied to termination for catastrophic events. Failure to pay plaintiff's costs for its services upon termination is a breach of the contract and a breach of the defendant's duty of good faith.

(2) Failure to pay plaintiff's costs is a breach of an implied contract between plaintiff and defendant.

(3) Plaintiff's services benefitted defendant which gives plaintiff a right to reasonable compensation.

## DISCUSSION

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). An adverse party, however, may not rest upon the mere allegations or denials of his pleading. RUSCC 56(f).

■■■ When considering cross motions for summary judgment, the court must evaluate each party's motion on its own merits. *Mingus Constructors v. United States,* 812 F.2d 1387 (Fed.Cir.1987). Cases which involve contract interpretation are particularly suitable for resolution by summary judgment since contract interpretation is a matter of law. *Government Systems Advisors v. United States,* 847 F.2d 811 (Fed.Cir.1988). When the record as a whole would not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court agrees with the parties that there are no genuine issues of material fact in dispute in this case. The court finds that this case is appropriate for disposition on the parties' motions for summary judgment.

The paramount issue is whether the contract provides for payment to plaintiff where defendant has terminated the contract due to catastrophic damage. Resolution of this issue requires a careful analysis of the applicable contract provisions in light of accepted principles of construction.

The interpretation of a contract is a question of law. *See B.D. Click Co. v. United States,* 222 Ct.Cl. 290, 297, 614 F.2d 748, 752 (1980). The court's function in interpreting the relevant documents is to discern the parties' intentions using well established rules of construction. *See Alvin, Ltd. v. U.S. Postal Service,* 816 F.2d 1562, 1565 (Fed.Cir.1987); *SCM Corp. v. United States,* 230 Ct.Cl. 199, 203, 675 F.2d 280, 283 (1982); *Rice v. United States,* 192 Ct.Cl. 903, 908, 428 F.2d 1311, 1314 (1970); *Dynamics Corp. of America v. United States,* 182 Ct.Cl. 62, 72, 389 F.2d 424, 429 (1968).

■■■ The court must interpret the contract to determine what the parties agreed to in their bargain. *See Salem Engineering and Construction v. United States,* 2 Cl.Ct. 803, 806 (1983). However, elements of agreement must be read in context to determine that intent, *Firestone Tire and Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971); *Rice v. United States,* 192 Ct.Cl. 903, 908, 428 F.2d 1311, 1314 (1970), as an agreement must be interpreted to give effect to all its parts, *SCM Corp. v. United States,* 230 Ct.Cl. 199, 203, 675 F.2d 280, 283 (1982); *Hol-Gar Manufacturing Corp. v. United States,* 169 Ct.Cl. 384, 385, 351 F.2d 972, 979 (1965), rather than leaving any part of the agreement meaningless, inexplicable, or superfluous. *Forter Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985). Nor should any contract provision be construed as being in conflict with another unless no other reasonable interpretation is possible. *Hol-Gar Manufacturing Corp. v. United States,* 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965).

It is also established that "the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *See Hol-Gar Manufacturing Corp. v. United States,* 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965); *Grimberg Co. v. United States,* 7 Cl.Ct. 452, 456, *aff'd.,* 785 F.2d 325 (1985). Courts are often placed in the position of a "reasonable and prudent contractor" when examining contract documents. *See Firestone Tire and Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971); *Grimberg Co. v. United States,* 7 Cl.Ct. 452, 456, *aff'd.,* 785 F.2d 325 (1985).

■■■ If the court finds that only one reasonable interpretation of the contract provision exists, the court's inquiry ends and the single reasonable interpretation will apply.

(4) Plaintiff is entitled to possession of the 2,312,000 BF of timber remaining on the site upon termination because the cancellation constituted a conversion of its property.

*See Cherry Hill Sand and Gravel Co. v. United States,* 8 Cl.Ct. 757, 767 (1985). However, if the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous. *See Bennett v. United States,* 178 Ct.Cl. 61, 64, 371 F.2d 859, 861 (1967); *Opalack v. United States,* 5 Cl.Ct. 349, 359 (1984). But, contract terms are not ambiguous simply because the parties disagree as to the contract's meaning. *Cherry Hill Sand and Gravel Co. v. United States,* 8 Cl.Ct. 757, 764 (1985). Indeed, it is inappropriate to strain the language of a contract to create an ambiguity. *Opalack v. United States,* 5 Cl.Ct. 349, 359 (1984).

■ Where there is a latent ambiguity, the doctrine of *contra proferentem* applies.[5] This doctrine provides that when the contract is latently ambiguous, it is to be construed against the drafter if the non-drafting parties' interpretation is reasonable. *See Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 514, 455 F.2d 1037, 1044 (1972); *Mountain Home Contractors v. United States,* 192 Ct.Cl. 16, 20–21, 425 F.2d 1260, 1263 (1970); *Temple v. United States,* 11 Cl.Ct. 302, 306 (1986); *Cherry Hill Sand and Gravel Co. v. United States,* 8 Cl.Ct. 757, 767 (1985).

■ Plaintiff contends that the contract should be construed against defendant under the *contra proferentem* doctrine. Specifically, plaintiff argues that Clause B8.222, the catastrophic occurrence clause, must be considered in conjunction with Clauses C8.2 and C9.5. Plaintiff argues that when the three clauses are read together as a whole, they reasonably indicate an intent to provide the purchaser with a recovery for its costs and services. According to plaintiff, this would "harmonize and give meaning to all of [the contract's] provisions." Additionally, plaintiff argues that since defendant failed to describe the rights and liabilities of the parties when it drafted Clause B8.222, the issue must be resolved in plaintiff's favor since contracts

of adhesion are construed against the drafter.

Defendant counter argues that when the contract is terminated under Clause B8.222, there is no provision for the payment of damages comparable to that provided in Clause C9.5. Therefore, defendant argues since the parties intentionally omitted an express damages provision in conjunction with Clause B8.222, the only reasonable interpretation of the contract is that payment of damages was not intended in a termination under the catastrophic damage clause. Further, defendant argues that in cases like this, the buyer and seller are excused from their mutual obligations which have been rendered impossible or frustrated as a result of conditions beyond their control. Thus, when the parties could not agree to a contract modification to reflect changed conditions resulting from the catastrophic destruction of timber, defendant asserts that the doctrine of frustration of purpose operated to dissolve the contract and to excuse the defendant from any obligation it may have had respecting payment.

It is uncontested that the blowdown of timber qualified as "catastrophic damage" under contract Clause B2.133. Thus, the Forest Service's termination notice given pursuant to contract Clause B8.222 was valid and in conformity with the express terms of the contract and the applicable regulation. 36 CFR 223.116(a)(3). Defendant, after unsuccessfully attempting to bargain in good faith with plaintiff to secure appropriate changes in the contract, had no recourse other than termination. It chose to effect that termination under Clause B8.222. Defendant's obligation was to salvage as much of the timber as possible through contracting with others before deterioration made salvage economically unfeasible. It could only achieve this objective by termination of the contract with plaintiff and entry into another contract with a third party. During the negotiations which preceded termination, plaintiff made no claim that its operations would

---

**5.** If there is a patent ambiguity, the doctrine of *contra proferentem* does not apply, and the non-drafting party has a duty to inquire into the meaning of the patently ambiguous clause. The clauses at issue in this case are not patently ambiguous.

cause environmental damage or would be significantly inconsistent with land management plans applicable to the sale area. Clauses C8.2 and C9.5 simply were not discussed in these negotiations. This is persuasive evidence that neither party believed that such claims were applicable.

The omission from that section of the contract covering termination for catastrophic occurrences of any damage requirement, logically means that neither party intended to pay damages to the other when the Forest Service elected to terminate for catastrophic damage. The contract specifically provides for a purchaser's recovery for described damage items when the Forest Service unilaterally terminates under C8.2. The fact that the contract did not similarly provide for a recovery of damages in the event of a Forest Service termination under Clause B8.222 is persuasive that no such recovery was intended.

Clearly, the purposes for termination under Clauses B8.222 and C8.2 are different. Under Clause B8.222, if the parties cannot reach an agreement to cover the sale of the windblown timber, the defendant must terminate the contract. It is clear that in such event the contract contemplates that each party will bear it own costs. This is an entirely equitable result when the loss was due to a *force majeure* circumstance, excusing both seller and buyer from their respective contract obligations. A Clause B8.222 termination recognizes that a frustration of the purpose of the contract has occurred. *See Texas Co. v. Hogarth Shipping,* 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123 (1921); *West Los Angeles Institute for Cancer Research v. Mayer,* 366 F.2d 220, 223 (9th Cir.1966), *cert. denied,* 385 U.S. 1010, 87 S.Ct. 718, 17 L.Ed.2d 548 (1967); *Patch v. Solar Corporation,* 149 F.2d 558 (7th Cir.1945).

This court refuses to interpret the contract to provide in conjunction with termination under Clause B8.222 a similar damage requirement as that expressed in C9.5. Such an interpretation would be tantamount to writing into the contract an entirely new provision. Such a rewriting would not "harmonize and give meaning" to all of the contract provisions. To the contrary, it would materially and unfairly restructure the bargained-for considerations in the contract. The court finds that the contract, when read as a whole, by its omission of any requirement for payment of damages in connection with termination under B8.222, shows a very clear and unambiguous intent to disallow a recovery of any damages when the Forest Service terminates the contract under Clause B8.222.

Plaintiff contends that the Regional Forester's September 27, 1984 termination letter gave rise to ambiguity and to a reasonable inference that the contract was also being cancelled because plaintiff's operations would result in "serious environmental damage" and "be significantly inconsistent with land management plans" applicable to the sale area. That letter, in explaining the need for termination under Clause B8.222, said such "action is necessary to expedite removal of windblown timber and minimize losses through deterioration." Plaintiff alleges further that those portions of Clause C8.2 dealing with environmental damage can be interpreted to include "the circumstances in our case." Plaintiff reasons that the termination letter implies that continuation of the contract would result in "serious environmental damage," the grounds for termination under Clause C8.2.

Plaintiff's interpretation of the contract is strained, unreasonable, and insufficient to create the ambiguity necessary to invoke the *contra proferentem* doctrine. The controlling Forest Service regulation, 36 C.F.R. Section 223.116(a)(3) (1982), is consistent with Clause B8.222. That regulation, which the Forest Service properly interpreted, provides that damages are not to be assessed against either party when there is a termination for catastrophic damage. The court finds that that interpretation is correct and controlling in this case. *See United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *Honeywell, Inc. v. United States,* 228 Ct.Cl. 591, 596, 661 F.2d 182, 185 (1981); *Barrington Manor Apts. Corp. v. United States,* 198 Ct.Cl. 298, 304, 459 F.2d 499, 503 (1972). Although plaintiff's interpretation is arguably "conceivable," this

alone is insufficient to establish ambiguity. *Southern Construction Co. v. United States,* 176 Ct.Cl. 1339, 1361, 364 F.2d 439, 453 (1966). Moreover, the language in the termination letter, upon which plaintiff relies, merely reflects the Forest Service's concern that all feasible steps were taken to minimize any further diminution in the value of the windblown timber through "deterioration," a reference to economic loss. There is no substantiation for plaintiff's averment that the Forest Service gave its termination notice to plaintiff to implement the Timber Management Plan of the Mt. Baker–Snoqualmie National Forest. Clearly, the contract was terminated only under clause B8.222 because of plaintiff's failure to agree to modifications subsequent to a determination of catastrophic damage.

In summary, there is no latent ambiguity or conflict in the applicable contract provisions. The Forest Service clearly intended to terminate the contract only under Clause B8.222 and the cited regulation for catastrophic damage after the parties failed to reach agreement on modifications to the contract. Had the Forest Service intended to terminate the contract on the grounds of environmental damage or inconsistency with land management plans, the letter notice would have referred to the pertinent clause (Clause C8.2) and perhaps to its implementing regulation, 36 CFR Section 223.40, as authority for the action taken. The court finds that the contact's provisions are not ambiguous, and that there is no basis for invoking the *contra proferentem* doctrine in interpreting these provisions. Further, the court finds that the letter notice effected properly a termination of the contract only under clause B8.222 and that Clauses C8.2 and C9.5 have no application. Accordingly, plaintiff is not entitled to any recovery of damages under these clauses.

▇▇▇ Plaintiff also seeks recovery of damages based upon other legal theories, including unjust enrichment, *quantum meruit,* restitution, rescission, an implied-in-

fact contract, and the takings clause of the Fifth Amendment to the United States Constitution. Plaintiff contends that the contract was cancelled before it removed the timber which had been harvested in the preceding months, and that the services plaintiff performed benefitted defendant in the amount of $33,600. Thus, plaintiff first claims entitlement to reasonable compensation for the services performed under the theories of unjust enrichment and *quantum meruit.*[6]

In *Tangfeldt Wood Products, Inc. v. United States,* 733 F.2d 1574 (Fed.Cir. 1984), the Government terminated a timber sale contract under Clause B8.222 because of the purchaser's failure to agree to a catastrophic modification also proposed under Section B8.33 of the contract at issue in that case. Plaintiff there sought restitution for the benefits conferred upon the Government by past performance prior to such termination. In rejecting plaintiff's argument, the United States Court of Appeals for the Federal Circuit held that because the Government's only purpose was to sell timber and have it removed from national forests, the Forest Service "left it to [plaintiff] to cut and remove the timber, and was not benefited by or interested in the felling, bucking, yarding, and decking if the contractor fulfilled the only desired function of cutting and removing the trees." *Id.* at 1576–77.

In this case, plaintiff, without any request or other inducement from defendant to continue its performance under the contract during negotiations with the Forest Service, unilaterally chose to recommence its harvesting activities in the sale area. Any benefit the Government may have realized on resale of the timber was not part of the consideration sought under the contract, but was "officiously conferred" upon the Government. *Id.* In these circumstances, defendant is not required to make restitution although it may have had knowledge of plaintiff's harvesting efforts. The court finds that *Tangfeldt Wood Products* controls this case and, therefore, pre-

---

6. This court does not have jurisdiction over contracts implied-in-law. *Putnam Mills Corpora-*

*tion v. United States,* 202 Ct.Cl. 1, 479 F.2d 1334, 1337 (1973).

cludes any recovery by plaintiff based upon an unjust enrichment theory.

■■■■ Moreover, contrary to plaintiff's contention, the facts do not show that defendant breached its duty to act in good faith and deal fairly with plaintiff or that its actions were in any way "unconscionable." *Tangfeldt Wood Products*, 733 F.2d 1574 (Fed.Cir.1984). Without a strong showing of such a breach, the court cannot find that the Forest Service acted in bad faith in its performance of the contract. Of course defendant was obliged to deal fairly with plaintiff, but the evidence shows it did, in fact, act in good faith. *See Louisiana–Pacific Corp. v. United States*, 228 Ct.Cl. 363, 656 F.2d 650, 652 (1981); *Squirrel Creek Associates v. United States*, 11 Cl.Ct. 212, 217 (1986). Further, good faith conduct by Government officials is presumed unless bad faith is shown. *E.g., Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 771 (1982); *Squirrel Creek Associates*, 11 Cl.Ct. 212, 218 (1986). It requires very strong proof to overcome that presumption. *Kalvar Corp., Inc. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301 (1976). Plaintiff has failed to show any evidence of bad faith by defendant. Therefore, the presumption of good faith stands unrebutted.

■■■■ Plaintiff's assertion that an implied-in-fact contract arose for compensation for plaintiff's costs is not valid. That assertion ignores the requirement that to prove such a contract, the same elements as those required for an express contract such as consideration, mutuality of intent, and actual authority to contract, must be satisfied. *Pacific Gas & Electric Co. v. United States*, 3 Cl.Ct. 329, 338 (1983). Plaintiff has failed to allege and prove the elements of an implied-in-fact agreement to compensate it for the value of its pre-termination work and services. There is not a scintilla of evidence suggesting that the Forest Service entered into a separate contract with plaintiff. Indeed, applicable Forest Service regulations directly conflict with the purported existence of an implied-in-fact contract. The court finds, therefore, that plaintiff has failed to allege and

prove the existence of an implied-in-fact contract to compensate it for its costs.

■■■■ Plaintiff's estoppel argument also has no merit. The basic elements of estoppel have not been shown to exist in this case. Estoppel requires that:

(1) the party to be estopped knows the facts;

(2) he must intend that his conduct shall be acted upon or must so act that the party asserting the estoppel has a right to believe that it is so intended;

(3) the latter must be ignorant of the facts; and,

(4) he must rely on the former's conduct to his injury.

*American Electric Laboratories, Inc. v. United States*, 774 F.2d 1110, 1113 (Fed. Cir.1985); *Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474, 484 (1976); *Pacific Gas & Electric Co.*, 3 Cl.Ct. 329, 338 (1983). Acceptance of benefits is not sufficient to constitute estoppel in the absence of affirmative authorization. *Pacific Gas & Electric*, Cl.Ct. 329, 338 (1983).

■■■■ Although defendant may have known the facts relating to plaintiff's harvesting efforts, it had no knowledge or notice of plaintiff's expectation of payment for its services should the negotiations fail and termination result. Defendant's conduct, which was simply to attempt to negotiate new contract terms covering removal of the blowdown, was entirely straightforward and not intended to mislead plaintiff to its detriment. The defendant's intent was to avoid or minimize the economic loss from the catastrophic damage in the affected area.

When plaintiff recommenced harvesting activity in April 1984, it knew it had not agreed upon any contract modification and that it was still negotiating for favorable changes in the contract's terms which it might not achieve. Clearly plaintiff was not ignorant of the facts but, to the contrary, was fully aware of the facts. It assumed the risk inherent in going forward with harvesting the timber without such a contract modification. There is no requirement in the contract that during the negoti-

ations following catastrophic damage that the purchaser must continue to fully perform under the contract. Realizing this, plaintiff finally ceased its harvesting efforts during modification negotiations. In these circumstances, it is inescapable that plaintiff did not rely upon defendant's conduct to its injury.

Further, as previously stated, plaintiff has not shown that defendant received a benefit from plaintiff's resumption of harvesting efforts; but even if defendant did receive a benefit, plaintiff has failed to show that the Forest Service's action was affirmatively authorized or that an official with actual authority to bind the Government properly ratified a contract to recompense plaintiff for its costs.[7] This failure would also preclude plaintiff's recovery. The court therefore finds that defendant is not estopped from withholding payment to plaintiff for its costs and expenses.

■ Finally, plaintiff's takings claim, assuming *arguendo* that it is properly before the court for consideration, is totally lacking in support.[8] The takings clause provides: "nor shall property be taken for public use without just compensation." Plaintiff has completely failed to state a claim under this clause. *See Shanghai Power Co. v. United States*, 4 Cl.Ct. 237, 240 (1983), *aff'd. memo*, 765 F.2d 159 (Fed. Cir.1985). Plaintiff cites authority for the proposition that its services constituted "property" within the meaning of the takings clause. *See Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); *Hedstrom Lumber Co. v. United States*, 7 Cl.Ct. 16 (1984). Its reliance upon

that authority, however, is misplaced.[9] It is well settled that a plaintiff must have a property interest in the thing which is claimed to have been taken before it can assert a takings claim. *Aulston v. United States*, 823 F.2d 510, 513 (Fed.Cir.1987). Plaintiff has not submitted any proof of any right of ownership in the timber. All of the timber left on defendant's property after termination was and remained defendant's property. *See* Defendant's App. at 16.[10] This court is without jurisdiction to determine whether a taking has occurred until the plaintiff establishes a legally recognized property interest in the timber. *Aulston v. United States*, 823 F.2d 510 (Fed.Cir.1987); *Freese v. United States*, 221 Ct.Cl. 963, 964–65 (1979). The court, therefore, finds that the takings clause provides no basis for a recovery for plaintiff.

### CONCLUSION

Plaintiff has stated numerous grounds for recovery of its costs. For the above stated reasons, the court finds that all of plaintiff's contentions are without merit. The court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment. The Clerk is directed to dismiss plaintiff's amended complaint. No costs.

---

7. The court has considered the affidavit of Robert G. McLachlan. His statement is immaterial in light of *Tangfeldt Wood Products* and defendant's presentation of its case.

8. Plaintiff's Fifth Amendment taking claim was not included in its motion for summary judgment, nor in its amended complaint. Therefore, it is not properly before the court. The above analysis, however, shows that even if it were properly before the court, plaintiff's taking claim is without merit.

9. The timber sale contract in *Hedstrom* was terminated pursuant to a statutory directive, § 6(b)(2) of the BWCAW Act, which required the Government to terminate the contract. In

this case, however, plaintiff's timber sale contract was terminated pursuant to an express contract clause which the parties had bargained for. Moreover, the statute in *Hedstrom* specifically authorized the payment of "just compensation" while the contract in this case did not provide for any compensation. Therefore, *Hedstrom* is easily distinguishable and does not support plaintiff's position.

10. This conclusion is supported by Section B8.11 of the contract which states that title to the timber remained in the U.S. since the timber remained on the sale area.